Annie Ammerman, Administratrix of Robert Ammerman, deceased, Appellant, v. Township of Coal.

*Negligence—Townships—Highways.*

In an action by a wife against a township to recover damages for the death of her husband, the evidence showed that the deceased, at the time he met his death, was driving home in an intoxicated condition, late at night, on a wagon road with which he was familiar. Parallel with the wagon road was a railroad. The intervening space, which was about thirty feet, was level, and vehicles could pass without inconvenience from the wagon road to and upon this space. Crossing the wagon road, the railroad and the intervening space was a mine drift about ten feet deep. The wagon road crossed the drift by a properly constructed and properly guarded bridge. It appeared that the deceased some distance from the

drift left the wagon road and drove over towards the railroad, and then, by a zigzag course, proceeded in the intervening space between the wagon road and the railroad, and finally, without ever reaching the wagon road again, drove into the drift, and was killed. *Held*, (1) that it was incumbent on the plaintiff to show that the accident resulted from the negligence of the defendant; (2) that no negligence of the defendant was shown, and, therefore, the plaintiff was not entitled to recover.

Argued May 25, 1898. Appeal, No. 148, Jan. T., 1898, by plaintiff, from judgment of C. P. Northumberland County, Sept. T., 1895, No. 1482, on verdict for defendant. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Trespass to recover damages for death of plaintiff's husband. Before SAVIDGE, P. J.

The court gave binding instructions for defendant.

The facts appear by the charge of the court which was in part as follows:

On the morning of March 30, 1895, Robert Ammerman was discovered to have been injured the previous night at a mine drift by the side of the public road leading from the borough of Shamokin, through Coal township towards Paxinos, not far from the Coal township and Shamokin borough line and near by the Cameron colliery. His horse was discovered dead in the drift and the road cart in the drift, broken. This mine drift extended across the public road, below grade, and across an intervening space of about thirty feet between the public road and the Philadelphia & Reading Railroad, and thence into the mountain. It was about ten feet deep, walled up before it entered the mountain, and the intervening space between public road and the railroad was not covered. There was a bridge over this drift thirty-one feet wide for the accommodation of the traveler on this public road. This bridge was almost the width of the public road. There is evidence in the case that, on either side, the public road, the traveled road, was somewhat wider than the bridge itself. At the bridge there was protection by guard rails at both ends, both sides of the road, the rails extending the width of the bridge and with a barrier sloping to the ground in the direct line of the guard rails. [It is not pretended that Ammerman drove off at the bridge. In fact it is

admitted that he did not get off the road at that point.] [1]
On coming from the borough of Shamokin, the direction from
which Ammerman was driving on this occasion, a covered
bridge was crossed some 385 feet south of the drift.   On leav-
ing this covered bridge the road turns sharply to the right and
thence leads in a direct line to the place of the accident.   The
traveled road was wide enough for several teams to pass and
repass, in fact the evidence shows that four teams or more could
have passed abreast at any point between the covered bridge
and the drift.   The road, it appears, was a level road, and, from
the evidence, was not out of repair and the bridge at the drift
was of sufficient width for three or four teams to pass abreast,
perhaps more.   Parallel with this road, on the east, runs the
Reading Railroad at an average distance of about thirty feet
from the eastern side of the public road.   According to the
undisputed evidence there was a ditch on the western side of
this road, not very deep, and over which vehicles could pass
without inconvenience and the space between the road and the
railroad was level, so far as we know smooth, so that travelers
could pass over without inconvenience, but it was not a part of
the public traveled road and was not intended as such.   [The
undisputed evidence is, that on leaving the covered bridge,
Ammerman, instead of turning to the right and following the
public road, continued in a direct line across the road and over
and upon the Reading Railroad, the wheels of his cart having
been within forty-six inches of the eastern rail and the horse
having been upon the railroad bed.   After having left the pub-
lic road he never again returned to it.   From the point where
he drove upon the railroad he turned to the right and drove
diagonally across from the railroad in a northeasterly direction
until he almost came upon the public road, possibly the one wheel,
the right wheel, of his cart coming upon the westernmost beaten
track of the public road.   Here again he turned and went
sharply back towards the railroad until he arrived at a point a
little more than midway between the public road and railroad
and from that point drove parallel with and between the two
directly to the point of injury and into the drift.] [2] . . . .

There were at the time, according to the undisputed evidence,
three switch lights on the railroad which he must have passed
in traveling over this course. . . . [It is complained that the

supervisors were negligent in not building a barrier at right angles to the public road at the drift so as to shut off the approach at the side of the road to the drift in question, or failing to do that they had not provided a barrier or guard rail parallel to the public road along its western side up to or near the covered bridge at the point coming over from Second street intersecting the road in question, which is at the northern end of the public bridge, and I believe, right at its approach. Under all the circumstances of the case we do not believe the law required this of the supervisors. The most that could be required of them was that they build barriers at the bridge itself. This they did. If the bridge was narrower than the road, which was perhaps so in this case, then we think it was their duty, as it is the duty of supervisors in all cases, to build wing walls if it be a bridge built of masonry, or barriers or guard rails thrown out to the right and left to the full width of the road so as to guide the traveler to the bridge so that while he may be traveling on the public highway he may not drive off the side of the bridge. There was no such rails at this bridge. That is, they did not bear off on either side of the bridge, on the right and left at each end, so as to widen the approach to the bridge, and if Ammerman had driven off at that point at the end of the bridge, driven from the traveled road over and directly into the culvert, there might be another question raised in this case. We think, however, that that is all that is required of supervisors. They are not obliged to go upon private property and build barriers to obstructions or openings like this which are not on the public highway proper.] [3] . . . .

We think that the traveler who strays from the public road does so at his own peril, and especially is it so in this case, where the road was not strange to the party injured. The evidence shows that he had frequently traveled this road; it led between his home and Shamokin where he often went. He was familiar with it and was bound to know the surroundings. [We conclude in the first place there was no negligence on the part of the township authorities; that they had done all under the circumstances that was required of them; that the road there was amply sufficient and safe to accommodate the ordinary traveler under ordinary circumstances. They are not to provide against anything extraordinary that might occur, nor is

there any evidence showing that anything extraordinary did oc-
cur at this time.] [4] [But there is another question arising
in this case, a legal one, which we think would be fatal to the
plaintiff's recovery, even if there was sufficient evidence to sub-
mit to the jury on the question of the defendant's negligence.
We conclude from the facts in the case that Robert Ammer-
man must have been guilty of contributory negligence, and the
law is, where there is contributory negligence shown on the
part of the party injured there can be no recovery.   Ordinarily
whether a party is guilty of contributory negligence or not is a
question for the jury, but where the evidence is so overwhelm-
ing and conclusive as to convince the court that he must have
himself contributed to the injury it becomes a question of law
for the court.   It is alleged, and we think that the facts show,
that this man was in a condition of intoxication.   He left Fish-
er's Hotel about 11 o'clock at night and at that time was not
intoxicated.   Afterwards he was found at the Eagle Hotel so
intoxicated, according to the uncontradicted testimony of the
only person who saw him, as far as we know, from the time he
left Fisher's until the accident, or until the next morning, so
intoxicated that he had to be helped into his cart.   He was
remonstrated with for undertaking to drive home that night
and offered a bed in the office of the stable but he persisted in
undertaking to drive home and with the result which we know.
Perhaps, under ordinary circumstances, the question of intoxi-
cation would be one for the jury, but taking into consideration
the facts and evidence in the case with the positive proof of
the manner in which he passed over the ground in question, we
think that it must be apparent to everybody that Robert Am-
merman was intoxicated and that was the reason he got off the
road.   But aside from the question of intoxication, the manner
in which he drove that night shows that he was negligent, that
he did not observe the rules required of every traveler on a
public highway in the exercise of ordinary care according to the
circumstances.] [5]

The theory of the plaintiff is that Robert Ammerman when he
left the bridge, either ignorantly drove directly over to the rail-
road, or else something must have frightened his horse that
caused him to take this direction.   In either event when he came
upon the railroad he must have known he was there; he stopped,

turned, came back toward the public road and never reached it. Now when he found himself upon the railroad it was his duty in the exercise of common prudence, to at all hazards put himself upon the public road, and it cannot be pretended that he could not have done this. . . . So far as we know there was nothing on the railroad to endanger him ; he simply drove over upon the road, found himself there, turned to come back on the public road and failed to reach it, again turned towards the railroad and then drove parallel along the public road between the public road and railroad and into this mine drift. [The Supreme Court has said in a case of this kind, that it is the duty of the traveler to get down and lead his horse back on the public road, if it is so dark that he cannot see.] [6] . . . .

Knowing the situation, having driven this road again and again, he must have known, if he was sober, that he was not traveling upon the public road from the point he left it up at the bridge to the drift, a distance of more than 300 feet. There was all this distance in which he could have placed himself back on the highway, and it seems to me, that no other conclusion can be reached than either that he was intoxicated, and did not know where he was or knowing himself on the highway was so indifferent as to fail in the ordinary care required to place himself on the safe way.

[Under the instructions of the court all you will have to do is to return a verdict in favor of the defendant and if we are wrong there is a remedy by an appeal to a higher court.] [7]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were (1–7) above instructions, quoting them.

*J. W. Gillespie* and *R. S. Ammerman*, with them *Lewis Dewart*, for appellant.—We contend that, whether it was negligence in the defendant to maintain the road at the place in question without some kind of protection, was a question of pure fact which it was the province of the jury alone to determine : Burrell Twp. v. Uncapher, 117 Pa. 353 ; Finnegan v. Township, 163 Pa. 135 ; Hogan v. Township, 174 Pa. 353 ; Penn Twp. v. Perry County, 78 Pa. 457 ; McCormick v. Washington Twp., 112 Pa. 185.

The township was bound to fill up or fence off a dangerous excavation at the side of a public road : Lower Macungie Twp.

v. Merkhoffer, 71 Pa. 276; Twp. of Plymouth v. Graver, 125 Pa. 24; Worrilow v. Twp., 149 Pa. 40.

The jury must determine whether the intoxication contributed to the injury; if it did not, it is of no importance: Healy v. Mayor, 3 Hun (N. Y.), 708; Robinson v. Piche & Co., 5 Cal. 460; Stuart v. Machias Port, 48 Me. 477; Ditchett v. Spuyten Duyvil, etc., R. R., 5 Hun (N. Y.), 165; 4 Wait's Actions and Defenses, p. 724; Vannatta v. Cent. R. R. of N. J., 154 Pa. 263; Wellman v. Borough of Susquehanna Depot, 167 Pa. 239.

*W. W. Ryon* and *S. P. Wolverton,* with them *C. M. Clement,* for appellee.—There was no negligence on the part of the township authorities; they had done all, under the circumstances, that was required of them. The road was amply sufficient and safe to accommodate the ordinary traveler under ordinary circumstances: Auberle v. McKeesport, 179 Pa. 321; Monongahela City v. Fischer, 111 Pa. 9; Perkins v. Inhabitants of Fayette, 68 Me. 152; Com. v. King, 13 Metc. 115; Blake v. Newfield, 68 Me. 365; Keyes v. Village of Marcellus, 50 Mich. 439; City of Scranton v. Hill, 102 Pa. 378; Jones on Negligence of Municipal Corporations, 157; Munley v. Hull, 3 Lack. Jur. 277; Schaeffer v. Jackson Twp., 150 Pa. 145; Herr v. Lebanon, 149 Pa. 222; Kieffer v. Hummelstown Borough, 151 Pa. 304; Brendlinger v. New Hanover Twp., 148 Pa. 93; Mueller v. Ross Twp., 152 Pa. 399; Long v. Milford Twp., 137 Pa. 122; Winner v. Oakland Twp., 158 Pa. 405; Crescent Twp. v. Anderson, 114 Pa. 646.

PER CURIAM, July 21, 1898:

We find no error in this record. A careful review of the evidence has satisfied us that there was no error in refusing to submit the case to the jury for their consideration, and in directing them to find for the defendant. It was of course incumbent on the plaintiff to show that the much to be regretted accident that befell her husband resulted from the negligence of the township officers in not maintaining the public highway in a reasonably safe condition. In that, she entirely failed, and hence, there was no error in directing a verdict in favor of the defendant. It is unnecessary to consider the specifications of error in detail. There is nothing in either of them that requires discussion.

Judgment affirmed.